UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| REBECCA WILSON, an individual | Case No. 1:13-cv-00122-BLW |
| Plaintiff, | MEMORANDUM DECISION AND ORDER |
| v. | |
| ST. LUKE'S REGIONAL MEDICAL CENTER, LTD., an Idaho corporation; MIKE McGRANE, an individual; KEVIN KRAAL, an individual; ROURKE YEAKLEY, an individual; JAMES PENNINGTON, an individual; and BRANDY BARTHOLOMEW, an individual, | |
| Defendants. | |

**INTRODUCTION**

Before the Court is defendants' motion for summary judgment (Dkt. 38). For the

reasons expressed below, the Court will grant the motion.

**FACTS**

Plaintiff Rebecca Wilson worked as a flight nurse for Air St. Luke's for

approximately ten years. She was fired on December 12, 2011. The "Corrective Action

Form" documenting Wilson's termination states that there had been "serious performance concerns regarding recent transport events." *Dec. 12, 2011 Corrective Action Form,* Dkt. 38-11, at 1. The form references two transports: (1) a November 30, 2011 transport of a maternity patient from Emmett, Idaho to St. Luke's in Boise, Idaho; and (2) a December 4, 2011 transport of a cardiac patient from Burley, Idaho to Utah.

Regarding the November 30, 2011 transport, the form states that Wilson "refused the transport without consultation with medical control and without assessing the patient." *Id.* Wilson disagrees with this characterization. It is undisputed, however, that Wilson questioned whether she should have been assigned to the transport; she believes the transport should have been assigned to St. Luke's "Maternal/Fetal" team. *Plaintiff's Response,* Dkt. 46, at 10. Wilson indicates that the pregnant patient was experiencing complications and she did not feel comfortable with her ability to care for a premature baby in the event of a delivery, and, further, that the ambulance she was in did not have the proper equipment to care for a premature baby. Ultimately, another team was assigned to the transport.

As for the December 4, 2011 transport, the form states that Wilson initially "appropriately question[ed]" the decision to send a cardiac patient from Burley, Idaho to Utah, rather than to a closer facility. Dkt. 38-11, at 2. It goes on to state that after being informed that the sending physician and the patient were aware of the risks, Wilson nonetheless "continued to repeatedly question the sending physician regarding the decision to send the patient to Salt Lake City and interven[ed] between the patient, the

sending physician, and the receiving physician without having assessed the patient." *Id.*

Wilson disputes St. Luke's characterization of this transport. She does not dispute, however, that she questioned the advisability of the transport, or that she spoke with the sending physician, Dr. McClain. It is also undisputed that Wilson was not at the patient's bedside, although she had received information about the patient's condition. Ultimately, Wilson's supervisors pulled her and her coworker, Terence McCue, off the transport. Another team – defendants James Pennington and Brandy Bartholomew – then completed the transport.

Shortly after completing the transport, Bartholomew spoke to defendant Dr. Rourke Yeakley. *See Transcript*, Dkt. 39-5. Dr. Yeakley is a co-medical director for Air St. Luke's and is one of Wilson's supervisors. During her conversation with Dr. Yeakley, Bartholomew criticized Wilson's conduct. She told Dr. Yeakley that she believed Wilson and Wilson's coworker Terence McCue had jeopardized Air St. Luke's business relations with Dr. McClain. She asked Dr. Yeakley if there would be "some follow up." *Id.* at 4.

The following day, Pennington expressed his concerns about the December 4 transport in an email to Dr. Yeakley, Dr. Kraal (another one of Wilson's supervisors), and various St. Luke's employees. *See* Dkt. 39-4. Dr. Kraal, who is also a medical director for Air St. Luke's, responded to Pennington's email after listening to the recordings of Wilson's conversations with Dr. McClain and others. Among other things, Dr. Kraal wrote:

I spoke with Dr. McClain last night. After reviewing the tapes I am frankly embarrassed by this incident. . . .  I am struck by number of things displayed by Beckie [Wilson] and Terry [McCue]. First, trying to get dispatch essentially to tell the sending facility issues related to clinical medicine. Second, not having a clue about the patient's condition and deciding what is best for him, despite the decision of a competent and quite thoughtful and compassionate physician who is at the bedside. Third, blatant exag[g]erations if not outright lies regarding transport times. Beckie is so clearly simply trying to get out of this transport it makes me crazy. Fourth, the number of calls back and forth for a very straightforward transport. . . .  I could go on. Frankly, I am furious. I laid in bed last night going over those tapes, and my conversation with Dr. McClain, and had those two been near me they would still be recovering. This is a not tolerable situation for me.

Dr. McClain was intimidated that a Boise ED doc would call him about this. He was grateful that you decided to send the twin fall crew eventually, but as I listen to the tapes I see how Beckie (with the encouragement of Terry) manages to suck more and more people into this. Terry did say one very accurate thing when he was on hold. "allright, that's it. I'm done with this"  He is. They both are. We have worked too hard to create a working relationship with our facilities to ever risk those two again. We all know this is a repetitive pattern. I feel badly that they were allowed to work here long enough to do something so blatant.

*Dec. 6, 2011 email from Dr. Kevin Kraal to Susan Gidding, James Pennington, Michael McGrane, Dr. Roarke Yeakley, and Deb Koch*, Dkt. 39-4, at 1.[1]

Shortly after Dr. Kraal wrote this email, Dr. Kraal and Dr. Yeakley withdrew their

"approval for Wilson to be credentialed and provide services as EMS personnel for Air

---

[1] During discovery, one of the parties designated this email (and other documents quoted in this decision) as "confidential" based on the Court's entry of a stipulated protective order.  *See* Aug. 15, 2013 Order, Dkt. 21.  After having reviewed this motion and the supporting papers, however, the Court concludes that portions of the documents quoted in this decision are not subject to protection. Accordingly, this Order will not be filed under seal.

St. Luke's." *See Dec. 8, 2011 Letter from Kraal and Yeakley to McGrane,* Dkt. 38-14.

St. Luke's terminated Wilson a few days later.

Wilson responded with this lawsuit against St. Luke's and various individual defendants. She alleges state-law claims for (1) unlawful reprisal in violation of Idaho's Human Rights Act; (2) wrongful termination in violation of public policy; (3) tortious interference with contract; (4) tortious interference with prospective economic advantage; and (5) defamation.

She also alleges a single federal claim – violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 to 12213. Regarding this claim, Wilson says that on November 22, 2011 – roughly three weeks before she was fired – Wilson's coworker, McCue, named her as a witness in his lawsuit against the hospital. In his lawsuit, McCue was pursuing claims that the hospital had violated the ADA. Wilson had also been supportive of McCue in the workplace by, among other things, refusing to downgrade a stellar performance review she had written for him. Wilson alleges that St. Luke's fired her in retaliation for supporting McCue's ADA lawsuit.

## LEGAL STANDARD

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private

resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## ANALYSIS

### 1. Wilson's ADA Claim

Wilson alleges that St. Luke's violated the ADA by unlawfully retaliating against her because she supported her coworker's pursuit of an ADA claim against the hospital. The relevant part of the ADA, 42 U.S.C. § 12203(a), provides that

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such an individual made a charge, testified, assisted, or participated in any manner in an investigation proceeding, or hearing under this chapter.

To establish a prima facie case of retaliation under this statute, Wilson must show that (1) she engaged in activity protected by the ADA, (2) she suffered an adverse employment action, and (3) there was a causal link between the two. *Brown v. City of Tucson*, 336 F.3d 1181, 1186-87 (9th Cir. 2003). If Wilson establishes a prima facie retaliation case, she will avoid summary judgment unless St. Luke's offers legitimate reasons for the adverse employment action. At that point, under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the burden shifts back to Wilson to demonstrate a triable issue of fact as to whether the proffered reasons are

pretextual. *See Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 849 (9th Cir. 2004).

For purposes of this motion, defendants concede that Wilson has established a prima facie case of retaliation. *See Reply*, Dkt. 49, at 5. The burden thus shifts to St. Luke's to offer legitimate reasons for firing Wilson. St. Luke's has met this burden. It has offered evidence that Dr. Yeakley and Dr. Kraal withdrew their approval of Wilson as an Air St. Luke's nurse because they believed she made decisions that either compromised patient care or disrupted Air St. Luke's relationship with other medical providers. *See, e.g., Yeakley Depo.,* Dkt. 39-1, at 46:22 to 47:13; 61:2 to 62:1; *Kraal Depo.,* Dkt. 39-2, at 22:19 to 23:14; 44:10 to 45:9; 60:6-11; 63:2-11; *McGrane Depo.*, Dkt. 39-3, at 15:10-22; 16:9-21; 19:13-16; 32:25-33:7; 82:11-83:6. Further, it is undisputed that, at the time they withdrew Wilson's authorization, neither doctor knew anything about Wilson's involvement in her coworker's pending lawsuit against St. Luke's, or any related fact. *See Sep. Stmt. Of Undisputed Facts,* Dkt. 38-2, ¶ 16.[2] After

---

[2] This is the factual assertion set forth in Paragraph 16 of Defendant's Statement of Undisputed Facts, Dkt. 38-2, which plaintiff did not challenge:

> At no time prior to Plaintiff's termination from employment with St. Luke's, did Defendants Yeakley and Kraal have any personal knowledge that Plaintiff had been identified as a witness in the McCue Suit, that she had complained about how McCue had been treated by St. Luke's, or that she had been asked to change her 2010 peer review assessment of McCue, nor did they consider these matters when they decided to withdraw their approval of her acting as a flight nurse with Air St. Luke's. Kraal Decl. ¶ 5, Yeakley Decl. ¶5.

This Court's Local Rules require a party opposing a motion for summary judgment to file a statement disputed facts. *See* D. Idaho Local R. 7.1(c)(2). Wilson did not file a separate statement.

Dr. Yeakley and Dr. Kraal withdrew their authorization for Wilson, St. Luke's suspended, and later terminated, Wilson, indicating that there were "serious performance concerns regarding recent transport events" and, further, that because Dr. Kraal and Dr. Yeakly had withdrawn their authorization, Wilson "no longer meets the minimal job requirements for her position . . . ." *Corrective Action Form,* Dkt. 38-11, at 1.

Given this explanation, the burden shifts to Wilson to show that St. Luke's proffered reasons for firing Wilson were pretextual. Wilson has two ways to establish pretext: She can do so by "directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1067 (9th Cir. 2003). Additionally, Wilson may rely on either circumstantial or direct evidence. *See Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221-22 (9th Cir.1998). "'Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption.'" *Id.* (citation omitted). If a plaintiff has direct evidence of a discriminatory motive, a triable issue of fact is created "even if the evidence is not substantial." *Id.* at 1221. If direct evidence is unavailable, a plaintiff may rely on circumstantial evidence to "to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable." *Id.* at 1222. Circumstantial evidence, however, "must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate on the basis of [a prohibited ground]." *Id.* at 1222.

Wilson has not provided direct evidence that St. Luke's proffered reasons for firing her were pretextual. Nor has she come forward with the "specific and substantial" circumstantial evidence necessary to create a triable issue with respect to whether St. Luke's intended to discriminate against her based on her support of McCue's ADA lawsuit. In her effort to establish pretext with circumstantial evidence, Wilson argues she that she was a proficient nurse; that there was no prior documentation of her failing to meet her job proficiencies; that Dr. Yeakley and Dr. Kraal wrongly withdrew their authorization; and that St. Luke's wrongly relied on this withdrawal in terminating her. *See Response,* Dkt. 46, at 2-8. Wilson also argues that because defendant Mike McGrane listened to the audio recordings related to the December 4, 2011 transport, at a minimum, he "must have known that Ms. Wilson did not display a lack of proficiencies of her job." *Response,* Dkt. 46, at 6. Defendant McGrane was the director of Air St. Luke's at the time, and thus was responsible for personnel evaluations.

In advancing these arguments, Wilson often veers into arguing that St. Luke's wrongly terminated a competent nurse. But that is not the question before the Court. Rather, the question is whether St. Luke's honestly believed the reasons for its actions. Thus, if St. Luke's honestly believed Wilson had serious performance issues, and that the withdrawal of authorization resulted in her failure to meet the minimum job requirements, then this is enough. "[C]ourts only require an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (citation

omitted; holding that the plaintiff's evidence of pretext was insufficient because the plaintiff failed to present evidence that the employer did not honestly believe its proffered reasons for its action).

After examining the evidence in the record, the Court concludes that Wilson has failed to point to any substantial, specific evidence that would allow a rational juror to conclude that St. Luke's harbored a retaliatory motive, or that it was lying when it said Wilson had performance issues and no longer met the minimum job requirements due to the withdrawal of authorization. To the contrary, the undisputed facts show that Wilson was terminated a few days after the December 4, 2011 transport, and that her supervisors – who knew nothing about her support of McCue's lawsuit – concluded that Wilson's conduct warranted corrective action, including withdrawal of their authorization and, ultimately, termination.

Because Wilson has failed to meet her burden at the third phase of the *McDonnell Douglas* burden shifting framework, the Court will grant defendants' motion for summary judgment on Wilson's retaliation claim under the ADA.

In addition to alleging retaliation under 42 U.S.C. § 12203(a), Wilson also alleges "retaliation" under sub-section (b) of Section 12203. *See Compl.*, Dkt. 1, at 8 (Wilson alleges a single claim for "Unlawful *Retaliation* in Violation of 42 U.S.C. § 12203(a) and (b)") (emphasis added). Sub-section (b) does not expressly deal with retaliation, however. Rather, this sub-section makes it unlawful to "coerce, intimidate, threaten or interfere with any individual in the exercise or enjoyment of, or account of his or her

having exercised or enjoyed . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(b). In alleging her single ADA claim, Wilson alleged that St. Luke's conduct related to her suspension and termination "was retaliation *and/or* coercion, intimidation, and threats . . . ." *Compl.*, Dkt. 1, ¶ 37 (emphasis added).

In opposing defendants' motion for summary judgment, Wilson does not distinguish between sub-sections (a) or (b). Rather, she generally focuses on a retaliation analysis, which would fall under § 12203(a). Further, Wilson does not argue or suggest that, in her case, the outcome or analysis would be different under § 12203(b). Indeed, Wilson does not even separately cite the two sections in her brief. *See Response Br.*, Dkt. 46, at 2-8. Under these circumstances, the Court concludes that Wilson's § 12203(b) claim fails for the same reasons her § 12203(a) claim fails.

## 2.       Wilson's Idaho Human Rights Act Claim

The Idaho Human Rights Act provides a means for enforcing  the federal Americans with Disabilities Act within the State of Idaho. Idaho Code § 67-5901(1). The Idaho Supreme Court analyzes retaliation claims under the state act in accordance with the *McDonnell Douglas* burden-shifting framework described above. *Frogley v. Meridian Joint School Dist. No. 2*, 314 P.3d 613, 619 (Idaho 2013). Wilson's claim under the Idaho Human Rights Act thus fails for the same reasons her ADA claims fail.

## 3.       Idaho's Peer-Review Statutes

Defendants argue that Idaho's peer-review act, *see* Idaho Code §§ 39-1392 et seq. immunizes them from Wilson's remaining state-law claims, which include wrongful

termination in violation of public policy, tortious interference with contract, tortious interference with prospective economic advantage, and defamation.

The Idaho Legislature enacted the peer-review act "[t]o encourage research, discipline and medical study by certain health care organizations for the purposes of reducing morbidity and mortality, [and] enforcing and improving the standards of medical practice in the state of Idaho, . . . ." Idaho Code § 39-1392. All hospitals subject to the act are required to form peer-review committees, which are responsible for "reviewing the professional practices of the members of the hospital's medical staff . . . ." § 39-1392f.

The act provides two separate protections related to the peer-review process. First, peer-review materials are protected from discovery in legal proceedings. *See* § 39-1392b. Second, those who participate in the peer-review process are immunized from civil liability. *See* § 39-1392c.

Defendants focus on the civil immunity provision set forth in § 39-1392c,[3] which provides as follows:

---

[3] Defendants also invoke Idaho Code § 39-1393(10), but the applicability of this section is limited to potentially immunizing defendants Kraal and Yeakley from any liability that may arise from notifying Idaho's Department of Health & Welfare that Wilson was no longer authorized to provide emergency medical services for Air St. Luke's. *See* Idaho Code § 39-1393(10) (immunizing "any person . . . that provides notification as required by law . . . from any civil or other liability *arising from providing the notification.*" Idaho Code § 39-1393(10) (emphasis added). The Court will address this issue below, in connection with Wilson's argument that Kraal and Yeakley defamed her by providing this notice.

The furnishing of information or provision of opinions to any health care organization or the receiving and use of such information and opinions shall not subject any health care organization or other person to any liability or action for money damages or other legal or equitable relief.

§ 39-1392c. Based on this statute, defendants broadly argue that "[s]ince the termination of Plaintiff's employment was indisputably a 'use' of Defendants' 'information' and 'opinions,' her dismissal and everything connected to it falls within the protective reach of Idaho Code § 13-1392." *Mot. Mem.*, Dkt. 38-1, at 11.

The conceptual difficulty with defendants' argument is that the hospital did not, at any point, form a peer-review committee to review Wilson's performance. Thus, it does not appear that the decision to fire Wilson was the result of any decision or study by a peer-review committee. Under these facts, immunizing defendants under the peer-review act does not seem to further its underlying purpose.

But despite this conceptual difficulty, defendants' argument gains some traction because the statutory definitions of "peer review records" and "peer review" do not explicitly require that peer-review activity be conducted by a formal peer-review committee. Rather, the term "peer review records" is broadly defined to include "all evidence of interviews, reports, statements, minutes, memoranda, notes, investigative graphs and compilations and the contents thereof, and all physical materials relating to peer review of any health care organization." Idaho Code § 39-1392a(12).

"Peer review," in turn, is defined as follows:

"Peer review" means the collection, interpretation and analysis of data by a health care organization for the purpose of bettering the system of

delivery of health care or to improve the provision of health care or to otherwise reduce patient morbidity and mortality and improve the quality of patient care. Peer review activities by a health care organization include, without limitation:

(a) Credentialing, privileging or affiliating of health care providers as members of, or providers for, a health care organization;

(b) Quality assurance and improvement, patient safety investigations and analysis, patient adverse outcome reviews, and root-cause analysis and investigation activities by a health care organization; and

(c) Professional review action, meaning an action or recommendation of a health care organization which is taken or made in the conduct of peer review, that is based on the competence or professional conduct of an individual physician or emergency medical services personnel where such conduct adversely affects or could adversely affect the health or welfare of a patient or the physician's privileges, employment or membership in the health care organization or in the case of emergency medical services personnel, the emergency medical services personnel's scope of practice, employment or membership in the health care organization.

§ 39-1392a(11).

Defendants also point out that in *Nightengale v. Timmel,* 256 P.3d 755, 759-60 (Idaho 2011), the Idaho Supreme Court concluded that a document may qualify as a peer-review record even if it was not created "during an actual peer review, . . . ." *Id.* at 760. Rather, the court concluded that the statute defining "peer review records" "simply requires that the document 'relat[e] to' peer review of a health care organization." *Id.*

*Nightengale* does not sweep as broadly as defendants suggest, however, and the facts are distinguishable. The key teaching from *Nightengale* is that if a person drafts a letter that is "clearly intended to initiate the peer review process," then that letter will be

protected from discovery because it "relates to" peer review.  *Id.* at 761.

In *Nightengale,* the defendant doctor failed to diagnose a clot in one of Nightengale's vascular arteries.  That condition cut off circulation to Nightengale's arm, which eventually was amputated above the elbow.  The orthopedic surgeon who performed the amputation (who was not a party to the litigation) sent two letters related to Nightengale's care.  *Id.* at 759.  The surgeon's "clear intent in writing these letters was to point out potential flaws he suspected might have occurred in Nightengale's care, such as her being overlooked because she was homeless and Hepatitis B and C positive, and to request *review and investigation* of those flaws in the hospitals' respective care."  *Id.* at 760 (emphasis in original).  The subject line of both letters stated "'Re: Case Review, Janet Bell [Nightengale]."  *Id.*  One of the letters stated, "Please review and examine this case.  I think this is a valuable case that should be reviewed by everyone including Vascular Surgery, Orthopedics, Hand Surgery, and the Emergency Room Department."  *Id.* at 760.

Under these circumstances, the *Nightengale* Court easily concluded that both letters "related to" peer review, and were thus privileged from discovery.  *See id.* ("Both letters relate to [q]uality assurance and improvement,' 'investigation activities,' and 'professional review' of Nightengale's treating doctors and hospitals.") (quoting Idaho Code § 39-1392a(11).

Unlike in *Nightengale,* none of the communications at issue here were "clearly intended" to initiate the peer-review process.  For example, in reviewing the disputed

December 5/6, 2011 email thread, Dkt. 39-4, the Court cannot conclude – particularly in the context of a summary-judgment motion – that the various authors clearly intended to initiate the peer review process. Wilson indicates that although employees sometimes discussed transports after the fact in team meetings or via committee, "[t]he December 5 and 6, 2011 emails . . . was [sic] not how we reviewed transfers." *Wilson Aff.*, Dkt. 47-7, ¶ 15. Another former St. Luke's employee has also stated that the comments made in the December 5 and 6 emails "were not common place peer review of transfers; . . . ." *Gidding Aff.*, Dkt. 47-10, ¶ 7. And none of the individual defendants have stated that, in sending the various communications, they intended to trigger the peer-review process. Finally, a key focus of these communications is not directly related to patient care or the best delivery of health care services; rather, the authors appear mainly concerned with protecting Air St. Luke's business.

Under these circumstances, the Court cannot conclude that the "information and opinions" defendant relied upon in terminating Wilson are "peer review" materials under the statute. As a result, the Court will not grant summary judgment on the state-law claims based on the immunity set forth in Idaho Code § 39-1392c. Rather, the Court will examine each of these claims individually, beginning with Wilson's claim that her termination violated public policy.

**4.  Wrongful Termination in Violation of Public Policy**

Generally, at-will employees may be terminated "at any time for any reason without creating liability." *Edmonson v. Shearer Lumber Prods.*, 75 P.3d 733, 737

(Idaho 2003). Nevertheless, if an employer fires an at-will employee for reasons that contravene public policy, the employer may be liable. *Bollinger v. Fall River Rural Elec. Co-op., Inc.*, 272 P.3d 1263, 1271 (Idaho 2012). The Idaho Supreme Court has repeatedly cautioned that this public-policy exception must be narrowly construed; otherwise it could swallow the rule. *Venable v. Internet Auto Rent & Sales, Inc.,* 329 P.3d 356, 361 (Idaho 2014) (quoting *McKay v. Ireland Bank*, 59 P.3d 990, 994 (Idaho Ct. App. 2002)). As the court has explained, "many activities and interests engaged in by employees benefit the community" but "not all of them are recognized as falling within the public policy exception." *McKay*, 59 P.3d at 994.

Terminating an at-will employee contravenes public policy only if the "employee is terminated for engaging in some protected activity, which includes (1) refusing to commit an unlawful act, (2) performing an important public obligation, or (3) exercising certain legal rights or privileges. *Id.* Deciding if a public policy is sufficient to protect an at-will employee from termination is a question of law. *Van v. Portneuf Med. Ctr.*, 212 P.3d 982, 991 (Idaho 2009). "In order to properly state a claim under the public policy exception, a plaintiff must specifically identify the public policy in question and then provide evidence to show a violation of the public policy." *Venable*, 329 P.3d at 362. A state's constitution, statutes, and case law generally dictate its public policy. *See Edmonson*, 75 P.3d at 737-38.

Wilson alleges that her termination contravenes various public policies.

## A.     Proficiency

Wilson's first argument that her termination violated public policy – though not framed as such – boils down to an argument that St. Luke's could not properly terminate her unless she "'fail[ed]to meet or maintain proficiencies' of her job." *Response,* Dkt. 46, at 8 (quoting Idaho Admin. Code r. 16.02.02.100.01.b. (Mar. 29, 2010)). The Court is not persuaded. Wilson was an at-will employee. St. Luke's had the right to terminate her – even if she was a proficient nurse – without incurring liability. Thus, Wilson's insistence that she was a proficient nurse, as measured by various guidelines set forth in the Idaho Administrative Code, is not relevant. Rather, the relevant question is whether Wilson was "terminated for engaging in some protected activity . . . ." *Van*, 212 P. 3d at 991. Serving as a proficient employee is not "protected activity." *See generally Orloff v. United Parcel Service, Inc.*, 490 Fed. Appx. 38, 39 (9th Cir. 2012) (unpublished decision) ("the Idaho Supreme Court has made clear that the initial trigger for the exception is the protectable action by the employee whose employment was adversely affected, not the bad motivation of the employer").

## B.     Patient Safety

Wilson next argues that her termination violated public policy because St. Luke's allegedly fired her for "declining a transfer that put a patient at risk." *Response*, Dkt. 46, at 9. Generally speaking, then, Wilson is arguing that her termination implicates the general public's health and welfare. The Idaho Supreme Court's decision in *Thomas v. Medical Center Physicians, P.A.,* 61 P.3d 557, 565 (Idaho 2002) is instructive on this

point.

In *Thomas,* a doctor was fired after he reported that another surgeon in the group falsified medical records and performed needless surgeries on patients to bolster his income. *Id.* at 566. The court concluded that "[r]eporting such misconduct falls under the public policy exception because the conduct alleged . . . is unlawful and it involves the health and welfare of the public." *Id.* at 565.

The alleged misconduct Wilson complained about is far different from falsifying medical records or gulling patients into having needless surgeries for financial gain. Rather, Wilson says St. Luke's wrongly (1) asked her to transport a pregnant patient who might deliver a very premature baby; and (2) transported a cardiac patient to Salt Lake City, rather than to a closer facility. Wilson did not believe she had the necessary skills to attend to the pregnant patient, and she thought that the cardiac patient should go to a closer facility. She questioned both transports and, ultimately, was told not to perform either one. So the question is whether St. Luke's is – as matter of public policy – prohibited from firing Wilson for refusing or questioning transports she believed put patient safety at risk. Or, put differently, the question is whether Wilson engaged in protected activity by questioning or declining these assignments.

The Court does not believe Wilson's conduct falls within the narrow public policy exception. Unlike in *Thomas,* Wilson was not questioning plainly unlawful, plainly harmful conduct. Moreover, there is no expert evidence establishing that St. Luke's put patient safety at risk by asking Wilson to attend to the pregnant patient. Similarly,

Wilson has not shown that St. Luke's put the cardiac patient at risk by flying him to Salt Lake City rather than to a closer facility. Ultimately, then, the record shows a difference of opinion as to (1) who should attend a transport; and (2) where a patient should be transported. The Court cannot conclude that Wilson engaged in "protected activity" by questioning or declining these transports. *Cf. Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 378 (Ill. 2009) ("Based on the narrow scope of a retaliatory discharge action, the general concept of 'patient safety,' by itself, is simply inadequate to justify finding an exception to the general rule of at-will employment.").

## C.      McCue's Lawsuit

Wilson also points to her participation in McCue's lawsuit against St. Luke's as evidence of unlawful reprisal in violation of public policy. However, this claim fails under the same analysis as her earlier retaliation claims under the ADA and IHRA. Simply put, the undisputed facts show St. Luke's terminated Wilson a few days after the December 4, 2011 transport, and that her supervisors – who knew nothing about her support of McCue's lawsuit – concluded that Wilson's conduct warranted corrective action, including withdrawal of their authorization and, ultimately, termination.

## D.      The Nevada Transport

Finally, Wilson claims that St. Luke's fired her because she questioned the legality

of an air-ambulance transport between Elko and Reno, Nevada[4].  After completing this transport, Wilson contacted the Nevada Nursing Board and concluded that she had violated the law because she was not licensed in Nevada.

Retaliation against an employee who refuses to commit illegal acts would violate public policy.  But at the time of the transport in question, Nevada law did not require nurses serving as attendants on air ambulances to be licensed.[5]  Specifically, as of 2011, Nevada Revised Statute § 450B.160 provided as follows:

> Licensed physicians, registered nurses and licensed physician assistants may serve as attendants without being licensed under the provisions of this section.  A registered nurse who performs advanced emergency care in an ambulance or air ambulance shall perform care in accordance with the regulations of the State Board of Nursing.

Nev. Rev. Stat. § 450B.160.6 (2011); *see also* Nev. Rev. Stat. § 450B.830(4), (5) (2011) (exempting the following from the provisions of chapter 450B:  "4. Ambulances and air ambulances based outside this State" and "5.  Attendants based outside this State.").

---

[4] Defendants say their records do not show any such transport, but they concede that the transport occurred for purposes of this motion.  *See Mot. Mem.*, Dkt. 38-1, at 3 n.2.

[5] In addition to Nevada Revised Statute § 450B.160, discussed below, defendants also invoke Nevada Revised Statute 632.340(5).  That statute, however, is irrelevant to this case.  It says that nurses who accompany and care for patients temporarily residing in Nevada do not need to be licensed.  *See* Nev. Rev. Stat. § 632.340(5) (exempting from licensing nurses "of another state whose engagement requires [them] . . . to accompany and care for a patient temporarily residing in this State . . . .").  This case does not involve patients temporarily residing in Nevada.

Based on this statute, St. Luke's could properly send out-of-state nurses (i.e., those not licensed in Nevada) to serve as attendants for in-state Nevada transports. Wilson contends that she was "performing advanced emergency care," *Response,* Dkt. 46, at 13, but she does not explain why this is so, nor does she point to any evidence to support that contention. The Court thus concludes that, to the extent it is based upon her conduct relative to the Nevada transport, Wilson's claim for wrongful termination in violation of public policy fails as a matter of law.

**5.     Tortious Interference with Contractual Relations**

Wilson concedes that the Court should grant summary judgment on her claim for tortious interference with contractual relations claim. *See id.* at 19.

**6.     Tortious Interference with Prospective Economic Advantage**

The Court will also grant summary judgment on Wilson's claim for prospective economic advantage. Here, Wilson alleges that individual defendants Kraal, Yeakley, McGrane, Bartholomew, and Pennington interfered with her employment relationship with St. Luke's. As a general rule, a party cannot interfere with its own contract, or with its economic relations with a third party. Rather, "a claim for tortious interference with contractual relations requires proof that the defendant is a stranger to the contract with which the defendant allegedly interfered and to the business relationship giving rise to the contract." *Beco Constr. Co. v. J-U-B Eng'rs*, 184 P.3d 844, 850 (Idaho 2008). The stranger-to-the-contract rule applies with equal force to claims for tortious interference with prospective economic relations. *See, e.g.,* 44B Am. Jur. 2d Interference § 7. Thus,

for Wilson's interference to be viable, she must establish that the individual defendants are strangers to her employment relationship with St. Luke's.

The Court easily concludes that three defendants – McGrane, Pennington, and Bartholomew – are not "strangers" to Wilson's employment relationship with St. Luke's. Each defendant is employed by St. Luke's and, as such, is an agent for the hospital. *See generally Beco*, 184 P.3d at 849. Agents, in turn, are liable for interference only if their actions are "'outside [their] scope of duty to the corporation.'" *Id.* (*citing Ostrander v. Farm Bureau Mut. Ins. Co.*, 851 P.2d 946, 950 (Idaho 1993).

There is not sufficient evidence in the record from which a rational juror could conclude that McGrane, Pennington, or Bartholomew acted outside the scope of their duties to St. Luke's. Generally, work performed to serve the employer falls within the course and scope of employment, whereas actions pursued for a *purely* personal purpose do not. *See Finholt v. Cresto,* 155 P.3d 695, 698 (Idaho 2007); *see also Wooley Trust v. DeBest Plumbing, Inc*., 983 P.2d 834, 838 (Idaho 1999) ("The employee must be engaged in some type of work that is assigned to him or her in the general sense of doing something to serve the employer.").

Wilson has not pointed to any evidence tending to show that McGrane, Barthlomew or Pennington acted purely for their own purposes. Instead, she relies on broad, conclusory statements such as this one: "Defendants McGrane, Kraal, Yeakley, Pennington, and Bartholomew all were acting in an intentional, wrongful manner, which was not within the scope of their agency." *Response*, Dkt. 46, at 19. These sorts of

conclusory statements are not sufficient to survive a summary-judgment motion. The Court will therefore grant defendants' motion on this claim as to McGrane, Pennington, and Bartholomew.

The more difficult question is whether Dr. Kraal and Dr. Yeakley are "strangers" to Wilson's employment relationship with St. Luke's, and thus capable of interfering with that relationship. Neither doctor is employed by St. Luke's. They provide services to St. Luke's as independent contractors.[6] Further, their contracts with St. Luke's state that they are not to be treated as St. Luke's employees or agents "for any purpose." *EMI-SLRMC Agmt.*, Dkt. 39-7, at 7; *Kraal-SLMVRC Agmt.*, Dkt. 39-9, at 5.

Despite this, Dr. Kraal and Dr. Yeakley argue that they cannot be liable on the interference claim based on the Idaho Supreme Court's decision in *Beco Construction Co. v. J-U-B Engineers*, 184 P.3d 844 (Idaho 2008). In *Beco*, a general contractor for a city project sued the project engineer for interference with the construction contract. The project engineer, though not a city employee, was acting as the city's agent and for the city's benefit. As a result, the court concluded that the engineer could not logically be considered a "stranger" to the contract between the city and its general contractor. *Id.* at 850.

---

[6] Dr. Kraal entered into a Medical Director Agreement with St. Luke's Magic Valley Regional Medical Center, Ltd. *See Ex. C to McGrane Dec.*, Dkt. 39-9. Dr. Yeakley provides services to St. Luke's through Emergency Medical Services of Idaho (EMI). EMI, in turn, has a Professional Services Agreement with St. Luke's Regional Medical Center, Ltd. *See Ex. A to McGrane Dec.,* Dkt. 39-7.

In *AMX International, Inc. v. Battelle Energy Alliance, LLC*, 744 F. Supp. 2d 1087

(D. Idaho. 2010), this Court narrowly construed *Beco*, concluding that the Idaho Supreme

Court had not clearly indicated that the stranger-to-the-contract doctrine should be

extended to shield anyone "beyond parties to the contracts or their agents, . . . ." *Id.* at

1092.[7] *AMX* further expressly rejected the argument that an entity with "*any* beneficial or

economic interest in, or control over" the business relationship underlying the allegedly

disrupted contract, is not a stranger to the contract. *Id.* at 1091.

This case, however, presents a different situation. Dr. Kraal and Dr. Yeakley are

not urging the Court to expand the stranger-to-the contract doctrine as broadly as were

the *AMX* defendants. That is, they are not relying solely upon a claim that they have a

generalized economic or beneficial interest in Wilson's employment relationship with St.

Luke's. Rather, they say they perform significant functions relative to Wilson's

employment with St. Luke's, including supervising her and assisting in performance

evaluations. *See Mot. Mem.*, Dkt. 38-1, at 26. As such, these doctors contend that they

were "indispensable to Plaintiff's job, bringing them within the protective reach of *Beco.*"

*Id.*

Wilson does not meaningfully address this part of the defendants' argument. In

---

[7] One commentator described *AMX* as a "useful corrective . . . to this steady expansion of the third party requirement" in interference cases." 14 *Callmann on Unfair Competition, Trademarks and Monopolies* § 9.5 (4th ed.).

fact, she does not cite or discuss *AMX*, which defendants discussed at length in their opening brief.  Nor does she discuss *Beco,* other than to generally assert that "[t]his case is not a *Beco* situation where Defendants McGrane, Kraal, Yeakley, Pennington, or Bartholomew acted within the scope of their agency when they intentionally interfered with Ms. Wilson's employment."  *Response*, Dkt. 46, at 19.  As that last quoted sentence reveals, Wilson lumps Dr. Kraal and Dr. Yeakley together with the St. Luke's employees, and then generally argues that all of these individuals acted outside "the scope of their agency."  *Id.*  So Wilson seems to accept the idea that, in theory, Dr. Kraal and Dr. Yeakley can interfere with her contract only if they were acting outside the scope of their agency.

The ultimate problem with Wilson's argument, as framed, is that she has failed to point to any evidence indicating that Dr. Kraal and Dr. Yeakley were acting purely for their own personal purposes.  Rather, as with the other defendants, Wilson relies on unsupported conclusory statements to make this point.  This is not enough.  The Court will therefore grant summary judgment in favor of Dr. Kraal and Dr. Yeakley on this claim.

**7.    Defamation**

The Court will also grant summary judgment on Wilson's defamation claim.

Preliminarily, the Court observes that ruling on defendant's motion for summary judgment on the defamation claim is a difficult endeavor because Wilson often speaks in generalities rather than separately pinpointing and analyzing specific allegedly

defamatory statements. And even when she does pinpoint and discuss a specific statement, she prefaces that discussion with this sort of inclusive language: "*among other statements that disregard the truth*, Defendant Kraal states that . . . ." *Response,* Dkt. 46, at 17 (emphasis added). In concluding her defamation argument, Wilson informs the Court that "[t]he comments discussed herein are just some of the many comments that are defamatory and that are the subject of Ms. Wilson's claims which she should be permitted to proceed with." *Response,* Dkt. 46, at 18-19.

Rather than address the defamation claim generally, the Court will sharpen the focus by looking to these five documents, which allegedly contain defamatory communications: (1) a transcript of a December 4, 2011 telephone conversation; (2) a December 5/6, 2011 email thread; (3) a December 8, 2011 letter from Dr. Kraal and Dr. Yeakley to McGrane; (4) a December 12, 2011 corrective action form; and (5) a December 22, 2011 letter defendants Kraal and Yeakley sent to Idaho's Department of Health and Welfare. *See* Dkts. 39-5, 39-4, 38-14, 38-11, and 39-6, respectively. The Court will address each of these communications in turn below, though it will first lay out the governing legal standards.

**A. The Governing Legal Standard**

To establish defamation, a plaintiff must prove that: (1) the defendant communicated information about the plaintiff to others; (2) the information was defamatory; and (3) the plaintiff was damaged because of the communication. *Clark v. The Spokesman-Review*, 163 P.3d 216, 219 (Idaho 2007).

There are various privileges that protect the publisher of a defamatory statement from liability, including the common-interest privilege. As its name suggests, the common-interest privilege protects individuals from liability if a defamatory statement is made to someone who shares a common interest with the speaker. *Barlow v. Int'l Harvester Co.*, 522 P.2d 1102, 1112-13 (Idaho 1974). Whether the common-interest privilege applies is a matter of law for the court. *Id.* The privilege is a qualified one; it can be lost if the publication is made with "express malice." *Id.*

Idaho's Supreme Court has defined "express malice" as "the publication of defamatory matter in bad faith, without belief in the truth of the matter published, or with reckless disregard of the truth or falsity of the matter." *Id.* at 1113. This definition of express malice apparently coincides with the Supreme Court's definition of "actual malice" in *New York Times v. Sullivan,* 376 U.S. 254 (1964). Under *New York Times,* actual malice exists if a statement is made "with knowledge that the statement made was false or was made with reckless disregard of whether the statement was false or not." *Steele v. Spokesman-Review,* 61 P.3d 606, 609 (Idaho 2002) (summarizing *New York Times'* definition of actual malice).

Actual malice then, is not malice at all, as that term is commonly understood, because it has nothing to do with how the speaker feels about the plaintiff. *See, e.g., Herbert v. Lando*, 441 U.S. 153, 199 (1979) (Stewart, J. dissenting) ("[T]he fact of the matter is that 'malice' as used in the *New York Times* opinion simply does not mean malice as that word is commonly understood."). Commonly understood, malice means

that a person harbors ill will or hostility *toward the plaintiff.  See id.*  Actual malice, by

contrast, deals with the speaker's attitude toward the truth.

In this case, Wilson's defamation complaint focuses on "actual malice," as she has

alleged that "Defendants . . . knew, or reasonably should have known, that the

information they communicated was false, and said Defendants made their statements in

bad faith or with reckless disregard for the truth or falsity of the matter."  *Compl.*, Dkt. 1,

¶ 62.  Common-law malice is not mentioned in the complaint.  Consequently, in

determining whether defendants acted with "express malice," the Court will focus on

actual malice, *i.e.,* the speakers' attitude toward the truth, as opposed to the speaker's

attitude toward the plaintiff personally.  Lastly, as a general rule, whether a

communication is motivated by express malice is a fact question for the jury. *Barlow,* 522

P.2d at 1112-13.  If, however, there is no evidence of malice and the undisputed facts

admit only one conclusion, the Court may decide the issue.  *Id.*

## B.  The December 4, 2011 Telephone Call

Wilson argues that she was defamed during a December 4, 2011 telephone call.

During this call, defendant Brandy Bartholomew spoke to a St. Luke's dispatcher, then to

Dr. Yeakley, then to a dispatcher again.  The call was recorded and later transcribed.  *See*

*Transcript,* Dkt. 39-5. The general tenor of Bartholomew's comments is that she believed

Wilson and McCue's conduct was serious ("a huge issue") and had significantly

undermined Air St. Luke's relations with Dr. McClain.  Bartholomew also wanted to "see

if there was going to be some follow up . . . ."  Dkt. 39-5, at 4.

The Court has carefully reviewed this transcript and concludes, as a matter of law, that Wilson was not defamed during the telephone call. For the most part, Bartholomew was expressing her opinions regarding McCue's and Wilson's conduct. Liability does not attach when a person expresses an opinion about another individual, regardless of how unreasonable the opinion might be. *Wiemer v. Rankin*, 790 P.2d 347, 352 (1990). Further, to the extent Bartholomew did make factual statements, Wilson does not meaningfully or specifically explain how any of these statements were defamatory.

Finally, even assuming that Bartholomew did defame Wilson during the telephone call, her statements are protected by the common-interest privilege. The participants in this conversation (Bartholomew, the dispatcher, and Yeakley) shared a common interest – providing emergency medical services for St. Luke's. *See Barlow,* 522 P.2d at 1112-13. And although this privilege can be overcome by a showing of malice, the record does not contain any evidence from which a rational juror could find that Bartholomew "in fact entertained serious doubts as to the truth of [her] statements" or that she "had a high degree of awareness of the probable falsity of her statements." *Olson v. EG&G Idaho, Inc.*, 9 P.3d 1244, 1249 (Idaho 2000) (quoting *Weimer*, 790 P.2d at 357).

### C. The December 5 and 6, 2011 Emails

The next document Wilson cites in support of her defamation claim is a December 5-6, 2011 email thread. Defendant Pennington began the thread by emailing Dr. Kraal, Dr. Yeakley, and various St. Luke's employees. Pennington expressed frustration with Wilson's and McCue's conduct during the December 4 transport of the cardiac patient.

Dr. Kraal and Bartholomew separately responded.

Although Wilson generally argues that all the emails (Pennington's, Bartholomew's, and Kraal's) are defamatory, she pinpoints only three specific statements in this email thread – all of which were made by Dr. Kraal. Specifically, Wilson takes issue with Dr. Kraal's statements: (1) that she did "not hav[e] a clue about the patient's condition; (2) that she made "blatant exaggerations if not outright lies regarding transport times"; and (3) that she "manage[d] to suck more and more people into this." *Response*, Dkt. 46, at 17 (quoting from Dr. Kraal's December 6, 2011 email at Dkt. 39-4).

It is debatable whether these statements are factual assertions or opinions. *See Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir. 1990). But even assuming they are factual in nature, the common-interest privilege applies. *See Barlow*, 522 P.2d at 1112-13. Malice could overcome this privilege, but Wilson has not pointed to any evidence that supports a finding of malice. Rather, in arguing that Dr. Kraal was malicious, Wilson generally relies on broad, conclusory statements. *See, e.g., Response*, Dkt. 46, at 17 (Dr. Kraal's email "expresses malice and disregards the truth."). Wilson does specifically say that Dr. Kraal said he "has no idea what the transfer times are," *Response*, Dkt. 46, at 17, but in his deposition, Dr. Kraal testified that although did not know *precise* transport times, he generally knows how long transports take. *See Kraal Depo.*, Dkt. 47, at 58:3 ("I know transport times"); *id.* at 58:1; *see also Kraal Depo.*, Dkt. 39-2, at 58:1 to 60:2. This evidence cannot support a finding that Kraal acted with malice in saying that Wilson had blatantly exaggerated, if not outright lied, about transport

times.  The Court thus concludes that the December 5 and 6, 2011 emails do not contain defamatory statements.

**D.  The December 8, 2011 Letter**

Likewise, the Court cannot find that the December 8, 2011 letter plaintiff relies upon supports her defamation claim.  In this letter, Dr. Kraal and Dr. Yeakley co-signed a letter to defendant McGrane.  In its entirety, this letter reads:

> After thorough investigation of the circumstances surrounding the December 4 request for transport by Dr. McClain from Cassia Regional Medical Center to Salt Lake City for care not available at the requesting facility (Flight #25393), it is our decision as Medical Directors of Air St. Luke's that we withdraw our approval for Beckie Wilson to be credentialed and thus provide services as EMS personnel for Air St. Luke's; this in accordance with the Idaho Administrative Procedure Act 16 Title 02 Chapter 02: Rules of the Idaho Emergency Medical Services Commission section 300, 03 b.

*Ex. L to Dale Aff.*, Dkt. 38-14.

This letter is not defamatory.  It reports a conclusion reached and an action taken. The Court is not persuaded by Wilson's argument that the letter should be viewed as defamatory because it implies that Wilson "failed to meet or maintain a proficiency of the job." *Response,* Dkt. 46, at 18.  But even if that were so, the communication would be protected by the common-interest privilege.  *See Barlow*, 522 P.2d at 1112-13.

**E.  The December 12, 2011 Corrective Action Form**

The next document Wilson cites in support of her defamation claim is a December 12, 2011 Corrective Action Form.  This form documents Wilson's "involuntary separation" from St. Luke's.  It is signed by defendant McGrane, as the "Department

Director" and by a St. Luke's Human Resources Representative. Within this document,

Wilson is informed that her "performance has been found unsatisfactory" for three

reasons: (1) "unprofessional conduct"; (2) "failure to follow procedure: and (3)

"performance issues." In a section entitled "Describe the incident(s) – who, what, where,

when, why – describe the behavior," the report summarizes St. Luke's version of the

November 30, 2011 and December 4, 2011 transports discussed above. It also references

the fact that St. Luke's Medical Directors withdrew their authorization.

Preliminarily, Wilson does not allege that St. Luke's distributed the form to

anyone but her. As a result, the Court concludes that this form, in and of itself, is not a

defamatory communication. Further, to the extent Wilson alleges that the form contains

defamatory statements, the common-interest privilege protects the speakers from liability

as the persons involved in this communication shared a common interest, and there are no

facts in the record from which a rational juror could infer malice.

### F. The December 22, 2011 Letter

Finally, Wilson says Kraal and Yeakley defamed her when they sent a letter to

Idaho's Department of Health and Welfare. *See* Dkt. 39-6. This letter, in its entirety,

reads as follows: "This letter is intended to inform the EMS Bureau that we, the Medical

Directors for Air St. Luke's, withdraw our approval for Terry McCue and Beckie Wilson

to provide services as EMS personnel for Air St. Luke's under our supervision." *See*

*Dec. 22, 2011 Letter from Kraal & Yeakley*, Ex. M to Dale Aff., Dkt. 39-6. This letter

reports an action taken; it does not say anything defamatory. Further, Wilson has not

meaningfully responded to defendants' argument that they are shielded from liability for the act of sending this letter under Idaho Code § 39-1393(10). The Court thus concludes that defendants did not incur any liability for sending this letter.

ORDER

**IT IS ORDERED that**

1. Defendant's Motion for Summary Judgment (Dkt. 38) is **GRANTED.**

2. Defendants' Requests to Take Judicial Notice (Dkts. 38-3, 49-1) are **GRANTED.**

3. Judgment will be entered separately in accordance with Federal Rule of Civil Procedure 58.

DATED: December 16, 2014

B. Lynn Winmill
Chief Judge
United States District Court